UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JASON R. MENKES and CHRISTINA D. NENOV,

                          Plaintiffs,          Civil Action No.

          v.

BOARD OF MANAGERS OF 561 5TH STREET    **COMPLAINT**
CONDOMINIUM, ALISON L. AVERA,
RICHARD R. PURTICH, LEN PATTERSON
SMALL, TRACY BRESLIN, KIRSTIN A.
PURTICH, MELISSA WACKS and LEN ROBERT
SMALL, all individually and as members and/or
agents of the Board of Managers of Defendant    An ECF Case
561 5th Street Condominium,

                 Defendants.
------------------------------------------------------------------X

     Plaintiffs Jason R. Menkes and Christina D. Nenov by their attorneys Pedowitz &

Meister, LLP assert the following as their Complaint against Defendants:

## INTRODUCTORY STATEMENT

1. This action is being brought because Defendants have unlawfully discriminated against

    Nenov by refusing to reasonably accommodate her disability. Defendants have mocked

    Nenov on account of her disability, made Plaintiffs unwelcome, and have treated Nenov

    in a disparaging manner because of, and in retaliation for, Plaintiffs' insistence that

    repairs need to be made because of the fact that the condition of the Building is unsafe

    and exacerbating her disabilities.

2. This action has also been brought because Defendants fraudulently concealed from,

    and/or misrepresented to, Plaintiffs before they purchased Condominium Unit 2 in the

    building known by its street address of 561 5th Street, Brooklyn, NY (the "Building").

    Defendants' extreme neglect of, the substantial deterioration of, and the pervasive leaking

problems of, the Building; as well as Defendants' unwillingness to thoroughly investigate and evaluate the need for and/or to make necessary repairs even at the risk of their personal safety; and Defendants' pattern of self-dealing. Following Plaintiffs' purchase Defendants continued with their self-dealing, selective enforcement of policies, bad faith, personal vendettas, hurtful mistreatment and their misrepresentations. Defendants have excluded Plaintiffs from conversations and decisions regarding the Building, have refused to attend to the Building's need for emergency repairs which has placed Plaintiffs, Defendants and the general public at personal physical risk, and made many decisions affecting the Building and its Unit owners without giving Plaintiffs a chance to be heard.

## NATURE OF ACTION

3. This action is brought to remedy claims of disability discrimination, in violation of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 USC §12131 *et. seq*. (the "ADA"); the Fair Housing Act, 42 USC §3601 *et. seq*. (the "Act"); and the Administrative Code of the City of New York Secs. 8-101 *et. seq*. (the "City law"). It is also brought to obtain relief because of Defendants' Fraud, Breach of Contract, Waste and Breach of Fiduciary Duties.

4. Plaintiffs seeks injunctive and declaratory relief, actual, compensatory, punitive damages, attorneys' fees, interest and other appropriate relief pursuant to Federal, State and City law.

## JURISDICTION AND VENUE

5. Plaintiffs have complied fully with all prerequisites to jurisdiction in this Court under applicable law.

2

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Secs. 1331 and 1343; and by 42 USC §12131 *et. seq.* and 42 U.S.C. §3601 *et. seq.* This Court has supplemental jurisdiction over Plaintiffs' City and common law claims.

7. As the unlawful practices complained of herein occurred, and Defendants regularly do business within the Eastern District of New York, venue is proper in this District pursuant to 28 U.S.C. Secs. 1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in Kings County, NY, or a substantial part of property that is the subject of the action is situated in Kings County, NY.

## PARTIES

8. Plaintiffs Jason R. Menkes ("Menkes") and Christina D. Nenov ("Nenov") were, and are, husband and wife and residents of New York City, NY. Nenov and Menkes are sometimes collectively referred to as "Plaintiffs" and individually by their last names.

9. Defendant Board of Managers of 561 5th Street Condominium (the "Board") is the Board of Managers that operates and manages the Building. 561 5th Street Condominium (the Condominium") was duly organized and established under the Condominium Act of New York and the Board of Managers was created thereunder and pursuant to the Declaration which was duly filed with the City Register on February 2, 2004. The Condominium is comprised of the four (4) condominium Units in the Building each of which is owned as hereinafter provided together with the common and limited common elements appurtenant thereto.

10. On information and belief, at all times material hereto all of the individual Defendants are, or have been, owners of Units in the Building and members of the Board, and/or its agents, and have participated in the running and/or maintenance of the Building.

3

11. Defendants Alison L. Avera ("Avera") and Tracy Breslin ("Breslin") are married and the owners of Unit 1. Defendants Richard R. Purtich ("Richard") and Kirstin A. Purtich, ("Kirstin") are respectively father and daughter and the owners of Unit 3. Defendant Len Patterson Small ("Len") is and at all times relevant hereto was President of the Board and has acted on behalf of the Board and individually. Len owns Unit 4 together with his father Defendant Len Robert Small ("Small"). Defendant Melissa Wacks ("Melissa") is the wife of Len and at all times material hereto has been an agent of, and acted on behalf of, the Board as well as individually.

## THE ALLEGATIONS

12. Nenov is, and at all times material hereto was, a person with a disability within the meaning of the ADA, the Act and the City law.

13. The Declaration of Condominium was duly recorded/filed on February 27, 2004 in the office of the City Register. The Declaration and the Bylaws authorize Units to be used by their owners "for any home occupation use permitted under applicable zoning law and ordinances, building code or other rules and regulations of governmental authorities having jurisdiction." On information and belief, the owners of Units 1, 3 and 4 periodically use their Units to do work in connection with their respective occupations.

14. Prior to purchasing Unit 2 at the Building on December 19, 2018, Plaintiffs made efforts to ascertain information about the physical condition and operation of the Building and the Board.

15. Prior to Plaintiffs' purchase of Unit 2, Len, as President of the Board, told Plaintiffs that the minutes of the meetings of the Board covering the period from December 2014 to June 2018 could not be found and, despite their request prior to their purchase he did not

4

make available for Plaintiffs' review the minutes of any Board meetings that took place after June 2018.

16. On October 25, 2018 Len wrote Plaintiffs' real estate lawyer saying "There were [Board] meetings, certainly, but either they [the minutes] were not logged, or I don't have access to them in my directory. We are meeting tomorrow, and I will see if I can get access." Len provided no minutes to Plaintiffs before their purchase.

17. Three months after their purchase, on March 6, 2019, Plaintiffs were first shown the minutes for the Board meeting in October 2018. They later received minutes for the meeting on March 6, 2019.

18. The "missing" minutes were never, including to date, or made available to Plaintiffs for their review by Defendants.

19. On information and belief, the minutes were not provided as a vehicle for Defendants concealing important information from Plaintiffs. Plaintiffs would not have purchased Unit 2 had they known of the actual decrepit condition of the Building or that Defendants engaged in self-dealing, selective enforcement, bad faith, or that they do not like owners who ask for accommodations for their disabilities.

20. Prior to their purchase of Unit 2 Plaintiffs made written and oral requests of Defendants for information regarding the condition of the Building, including but not limited to information regarding the existence of present, and proximately close in time past, water leaks into the Building.

21. Neither the Board, nor the Defendants, nor the Board's attorney, disclosed to Plaintiffs before their purchase that there had been problems with water leaks that had occurred or that were ongoing in the Building other than for Len to orally say words to the effect that

there had been leaks in the past but he believed they were resolved. The Board's attorney, Ruth Kalbitzer ("Kalbitzer"), is a lawyer employed by Len's father-in-law's law firm, and is the person who told Len how to respond to the written questions posed by Plaintiffs' real estate lawyer for information about the condition of the Building.

22. The aforesaid failure to disclose was intentionally and/or negligently made by Defendants to Plaintiffs in breach of Defendants' obligations to prospective purchasers and with the intent of misleading and/or recklessly causing injury/damage to Plaintiffs. Plaintiffs were not even told about the bursting of a pipe in Unit 1 that had taken place in or around October 2018.

23. On information and belief in the months before Plaintiffs closed on their purchase of Unit 2, there was a leak from the roof above Unit 4 that was not repaired and neither the owners nor occupant of Unit 4, nor any of the other Defendants, told Plaintiffs about that leak.

24. An inspection of Unit 4 on May 6, 2019 disclosed a leak coming from the roof into the living room ceiling behind the kitchen. On information and belief that is the same leak as the one which preceded Plaintiffs' purchase of their Unit.

25. Prior to purchasing their Unit, Defendants did not tell Plaintiffs that no action would be taken to stop Len and Melissa of Unit 4 from storing their belongings in the common stairway landings of the Building and the lobby. Storing things in the hallways and by the interior stairs of the Building is a violation of the Condominium's Declaration, Bylaws, the Rules and Regulations of the 561 5th Street Condominium and of the NYC Fire code.

26. Additionally, Breslin and Avera have been allowed, improperly and in violation of

applicable Codes, to store their personal belongings in the common areas and in the storage closet under the stairs of the Cellar, and in a manner that dangerously blocks access to the boiler room, electrical meters, ladder to the exterior and gas meters.

27. Prior to Plaintiffs purchasing their Unit, Defendants did not tell them that a prior owner of Unit 1 had done work on its cellar level – creating new rooms, adding partitions, large closet, and adding a bathtub with shower thereby converting a powder room to a full bathroom – all of which was, and is, out of compliance with applicable NYC building codes and is work for which plans should have been filed and approved but were not and which remain in violation of the Bylaws and the NYC Dept. of Buildings code. The Offering Plan even says that "Purchaser of the duplex unit 1 should note that the cellar space (a portion of the duplex) may not be used as residential space."

28. Shortly after purchasing Unit 2, Plaintiffs discovered that water was leaking into Unit 2 through the walls around one of the windows and the wall outside of and around the closet in the master bedroom.

29. Immediately after Plaintiffs purchased their Unit, they told Len, and then Avera, that there was water leaking into their Unit. Avera and Len encouraged Plaintiffs to obtain estimates from contractors to fix the problem so the Board could vote on it.

30. On several occasions after that, and despite virtually nothing having been said about it to Plaintiffs prior to their purchase, Avera said that she remembered the prior owners of Unit 2 saying they had experienced a lot of problems with their apartment and master bedroom which, given the context, was interpreted to mean with respect to water leaks.

31. In response to Len and Avera's encouragement Nenov took contractors through their Unit and to see the exterior of the Building so that the necessary repair work could be

7

determined, and the cost itemized in a bid for presentation to the Board. These inspections were prerequisite to ascertaining the scope and nature of the repair work needed to safeguard Plaintiffs' Unit.

32. Initially Defendants cooperated by giving access to the limited common areas so that the contractors and other professionals could observe the Building's walls, roof and drainage systems. However, at some point thereafter the Defendants made access unreasonably difficult and sometimes denying all access. The denials were and are in contravention of the Declaration of Condominium which provides that "Each Unit Owner shall have an easement in common with all other Unit Owners to use, maintain, repair, alter and replace all Common Elements located in any of the other Units or elsewhere on the property which serve his or her Unit."

33. In late February 2019 Plaintiffs told Defendants that they wanted to have a Board meeting to review what they were learning and to make sure that they were doing things correctly with respect to working towards preparing to have the repair work done. Defendants continued to encourage Plaintiffs to get bids for the work and Plaintiffs said they would.

34. Early on Avera indicated that despite her indications to the contrary, she was not particularly open to learning about or fixing the problems. For example, on several occasions Avera undermined Nenov by, in the presence of Nenov, telling the contractors she was taking around the Building, words to the effect of "that a little repointing was all that needed to be done".

35. Avera's words made it appear that all of the Unit Owners were not committed to doing the necessary work. Neither Avera nor any of the other Defendants asked the contractors

8

Nenov brought to the Building why they were recommending what they did or why a more limited scope of work would not be sufficient.

36. Plaintiffs were told that the Board meeting would only last for 45 minutes. When they asked to have it extended because the repair work, and disability accommodation requests needed to be addressed, Plaintiffs were told to prioritize what was important to them because not everything could be discussed. Breslin even modified the agenda after the meeting had started to add information about their having FIOS. Getting FIOS involved drilling through the exterior walls but that was not disclosed during the Board meeting.

37. On March 4th Avera said, "Christina . . . we want to prioritize the items that will help expedite getting your apartment move-in ready." The word "prioritize" became the word of choice that was used by Defendants as a euphemism for putting off and effectively silencing what Plaintiffs needed – whether it was the disability accommodations, or repairing the Building. Decisions that individual Defendants wanted addressed were promptly taken care of.

38. By their actions and words at and before the March 6th Board meeting Defendants made it clear that they did not share, or credit, the importance given by Plaintiffs to stopping the leaks into Unit 2, examining the causes for the leaking, repairing the Building or providing accommodations for Nenov's disability. At the March 6th meeting Len and Avera announced that the Board's attorney, Ruth Kalbitzer, had been hired to help Len answer the questionnaire about the Building's condition that was sent to Plaintiffs before their purchase.

39. During a March 25, 2019 phone call, Nenov spoke with Defendant Richard who said that he could not have construction done within the upcoming weeks because his daughter

was going to be traveling out of town.

40. Nenov sent the first bid she obtained from a contractor to Defendants on March 26th and

Avera wrote the Board two days later acknowledging receipt of the bid and saying

> We need to schedule a condo meeting as soon as possible to
> begin to discuss the following:
>
> 1. Review the list of issues and decide which we want to
>    address, delay, or not do. We can set up a folder in google
>    docs where we can create a list of issues and store related
>    documentation.
> 2. For the issues we choose to address and prioritize, discuss
>    the options to address those issues.  Determine our
>    preferred course of action or identify next steps where
>    additional information is required to make a decision.
> 3. Select contractor(s) where we feel sufficiently competitive
>    bids are available. Develop a plan for getting more bids
>    where necessary.
> 4. Determine the financial responsibilities of the condo
>    association.

41. On April 1, 2019 Len scheduled a Board meeting for April 11th.  The same day Len told

Plaintiffs that the Board's attorney would be attending the Board meeting "to help out

with all of our questions".

42. Plaintiffs were not consulted about having an attorney to represent the condominium and

attend the meeting.  Nenov promptly wrote back asking Len why there was going to be

an attorney, who was going to pay the attorney and how much was the cost.  On April 2,

Len responded saying

> I have suggested Ruth [the attorney] attend on behalf of the
> Condo. We are entering new territory in terms of
> responsibility and costs; after the last meeting, I received
> many questions, and a majority requested legal advice to
> interpret the condo bylaws and guide decision-making. I
> want to be in agreement in all ways as we proceed. The
> retainer fee is $350/hour and would be paid out of the
> Condo association to avoid any potential conflict of interest
> by any unit owner.

43. Plaintiffs were not told who the "majority" was that requested legal advice. They were not consulted or told that anyone wanted to have a lawyer at the meeting. Plaintiffs were not told what potential "conflict of interest" Len was referring to in his April 2 email. And, Plaintiffs were not told that the attorney actually represented Defendants in opposition to Plaintiffs.

44. Plaintiffs were not told that the chosen lawyer, Kalbitzer, is an associate at and an employee of Defendant Melissa's father's law firm. The foregoing evidenced the continuing pattern of Defendants excluding Plaintiffs from the operation of the Building and running of Defendant Board.

45. On April 2nd Plaintiffs expressed their upset and frustration at being excluded from the discussion and decision-making process that led to inviting a lawyer to the meeting. Plaintiffs advised that they would "appreciate that this sort of proposal and debate of financial decisions (ie. hiring of the condo lawyer) be made during public conversations/meetings and that they are not assumed for or partaken in private, etc.".

46. In a continued effort to get the needed work attended to, Nenov wrote to Len on April 2 expressing her understanding of emotions but pointing out the need to make the repairs by saying, *inter alia*, that

> . . . there is a very real need to take remedial steps in an effort to preserve the building and protect the owners from further damage. I am hoping that by promptly acting together that these obstacles can be overcome to the betterment of all.

47. On April 3, in preparation for the upcoming Board meeting Len sent an email to Plaintiff, again pointing out the need to "prioritize":

> Hi Christina and Jason,

> There is little doubt that there are issues in all of the areas you've outlined. I've seen some in person myself, and you've photographed everything you have been able to in great detail. . . . . If you are having another contractor through on Thursday, perhaps some Condo members can join you if they are available.
>
> To be clear, the mission of this meeting is more about protocol:
>
> 1. Clarity: itemizing all the areas and issues.
>
> 2. Policy: Getting a full agreement of the Condo's responsibilities.
>
> 3. Actionable items: What are the *most essential steps we can get moving?

48. In April 2019, Plaintiffs retained counsel because Defendants' actions evidenced that the "Board's attorney" did not represent Plaintiffs. After Plaintiffs' attorney contacted Kalbitzer, on April 9, 2019 Len "paused" the scheduled April 11th Board meeting.

49. On December 18, 2018, the same day Plaintiffs purchased Unit 2, Nenov told Len that she is a disabled person. Three days later she told the same thing to Avera, in the same week she told Kirstin, and she also wrote to each Unit in the Building saying that she was disabled and had need of certain reasonable accommodations and "hoped they would be welcoming and inclusive".

50. At various times thereafter Nenov requested reasonable accommodations be made in the form of placing handrails on the Building's entry stairway, taking obstructions off of the Building's entry stairway, moving things from the utility room because they blocked her access to the boiler room and making the ladders that goes from the street into the basement and from the 4th floor to the roof safer for someone with a disability like Nenov.

51. Whenever the matter of making accommodations was raised, Plaintiffs were told to prioritize their "asks" because the addressing of requested accommodations would delay their ability to move into the Building.

52. After Nenov explained to Defendants that she needs a railing added to the outside Building stairway to accommodate her disability, Defendants responded by placing flowerpots on one side of each step of the first flight of the outside stairway and on the landing at the top of that first flight. Nenov emailed Len, president of the Board, that the flowerpots, and a very large broken pot, constituted a danger to her and asked to have them removed. Len did not respond to Plaintiff's email.

53. Defendants then moved them to the second flight of stairs of the outside stairway where they again constituted a danger to her. Thereafter the flowerpots were relocated to be on the hatch cover and thereby obstructing the only public entrance to the Building's cellar utility room.

54. To date, each of the requests for accommodations (other than finally taking the many flowerpots off the outside stairs of the Building) have not been acted upon by Defendants.

55. Nenov's requests for accommodations have been ridiculed by Defendants as being unnecessary and not a Building priority, Plaintiffs' requests have been ignored and/or not acknowledged, and Defendants have not participated in an interactive process with respect to Nenov's requests.

56. Defendants Breslin and Avera cancelled Nenov's ability to use the alternate access to the Building's cellar, which is used by the other Defendants, and which requires going through Unit 1. Melissa and Len also cancelled Nenov's ability to use the alternate

13

access to the roof by going through Unit 4. The other Defendants have not asked Breslin and Avera, or asked Len and Melissa, to restore their respective means of access to Nenov as a reasonable accommodation.

57. The air quality in Unit 2 is poor and causes those in Unit 2 to get headaches and a burning sensation in the throat. Nenov's physician instructed Plaintiffs not to spend too much time in Unit 2 until the air quality is improved. Plaintiffs told Defendants what their doctor said but Defendants have taken no action to improve the air quality or find out the cause for the problem. In fact, when Plaintiffs tried to have experts ascertain the causes for the air quality issue Defendants blocked their access.

58. The contractors Nenov took through Unit 2 to get bids for work on the Building told Nenov that Unit 2 should be tested for mold. At least two contractors, whose bids had been given to Defendants, also said that the services of an engineer and of an architect should be employed in order to plan the necessary Building repairs. Defendants have failed and refused to hire an architect or engineer.

59. The two attorneys spoke and agreed that a licensed professional engineer, and not a building inspector who was not an engineer, should be hired by the Building so that its water leak problem could be fully evaluated and a plan for rectifying it could be set forth and agreed to.

60. The two attorneys agreed that each would come up with proposed engineers so that one could be selected from among them. A proposed engineer and the terms for his services was put forward by Plaintiffs on April 25th prior to the agreed deadline. Kalbitzer said that additional time was needed by Defendants for them to nominate an engineer.

61. When Defendants finally proposed someone after the original deadline for doing so,

14

Kalbitzer said that the person was an engineer. After being told by Plaintiffs' attorney that the person nominated by Defendants was in fact not an engineer, Kalbitzer said that the Defendants did not want to use Plaintiffs' proposed engineer because they did not feel that his credentials were suitable and instead wanted to use a building inspector who has no professional engineering degree and who would be less expensive.

62. Defendants refused to use a professional engineer and the Board hired a regular building inspector to do the inspection. As part of their escalating pattern of excluding and belittling Nenov, Nenov was prohibited from participating in/attending the inspection and was also told that she could not even be in her own Unit when it was being inspected. By contrast, Avera was preferentially designated by Defendants to participate in the inspection and to be in Plaintiffs' Unit while Nenov could not be in her home when it was being inspected.

63. On information and belief at the time of the aforesaid inspection Avera already knew that she planned to list Unit 1 for sale and that information was kept hidden from and not provided to Plaintiffs. By personally participating in the inspection, without disclosing her intentions, Avera was able to "innocently" deflect the inspector and to cause the inspector to minimize the severity/meaning of his observations.

64. The report by the building inspector nominated by Defendants, dated May 6th, was not as thorough as, and did not bring to bear the knowledge, that would have resulted from having had an engineer do the inspection. Among other things, the inspector noted that the decks appurtenant to Units 3 and 4 improperly rested on the roof (something that can cause leaking). However, he did not and could not determine the condition of the roofs under them or the fact that the poor installation or workmanship of the deck appurtenant

to Unit 3 had caused, and was continuing to cause, dangerous structural damage to the Building.

65. Plaintiffs retained a Certified Industrial Hygienist ("CIH") to inspect Unit 2 and the Building in order to ascertain the existence/scope and source of any leaking, mold/environmental problem and related health issues. The need for the CIH inspection was told to Defendants as was the fact that access to certain Building common, and limited common, areas had been requested by the CIH in order to do a comprehensive job.

66. On two separate occasions, and despite advance permission having been duly requested by Plaintiffs, Defendants Kirsten and Richard and Avera and Breslin unconditionally denied Plaintiffs' requests for access so that Nenov could take the CIH through the Building's limited common areas in order for the roof, decks, walls and parapets to be examined for the cause of leaking .

67. Plaintiffs engaged a structural engineer to inspect Unit 2 and the Building to determine how the water leaks into the Building should be resolved. The person selected by Plaintiffs is a licensed engineer and a licensed architect (the "Engineer"). Plaintiffs told Defendants why the inspection was needed and of the fact that access to certain Building limited common areas was needed by the Engineer in order to properly do his job.

68. Defendants, by their individual attorney, gave limited approval to Plaintiffs' request and took the opportunity in an email to Plaintiffs' counsel, which was copied to Defendants Avera, Breslin, Richard, Kirstin, Melissa and Len, to threaten, mock, insult and humiliate Nenov by saying

> Given your advice this morning of your clients [Protected Health Information redacted] and [Protected Health Information redacted]

16

disability, please understand that the unit owners who I represent do not consider it safe for her to accompany the engineer and architect. Therefore, it is requested that the professionals perform their inspections without "assistance" from your client. If she attends the inspection contrary to my caution, her activity of walking and crawling around and climbing on the building will be duly noted.

69. Defendants conditioned their approval of Plaintiffs' request for the Engineer's inspection: (a) on Nenov agreeing not to be in the presence of the Engineer while the inspection was being conducted; (b) on Defendants being given an indemnity from Plaintiffs and the Engineer against damage/injury; (c) on Plaintiffs agreeing to give Defendants a copy of the Engineer's report without charge to Defendants; and, (d) on Plaintiffs confirming that the cost of the Engineer was that of Plaintiffs and not of the Defendants.

70. Defendant Melissa lives in Unit 4 and was the person designated by the Board to take Plaintiffs' Engineer and Menkes on the inspection. She could have easily allowed Nenov, the Engineer and Menkes to use the interior stairs in her Unit in order to access the roof, as had previously allowed in past inspections, but did not. The Engineer and Menkes were made to access the roof by climbing up a ladder while Melissa walked up her interior stairs that were feet away in her Unit.

71. To Plaintiffs' knowledge such conditions were never placed on any of the Defendants who wanted to take a professional through the Building for an inspection and/or repair of the Building or any part of it. The conditions imposed on Plaintiffs were in retaliation for Plaintiffs having told Defendants that they were contemplating suit because of how Plaintiffs were being treated.

72. The Engineer conducted his inspection on May 24, 2019. Following it he told Plaintiffs that his inspection disclosed a combination of circumstances that call for immediate

corrective action in order to protect the Building and the people in it. According to the Engineer, the "Property/space [is] uninhabitable". It is also his professional opinion that the deck appurtenant to Unit 3 was improperly installed, has caused and is causing serious damage to the Building's walls and that as a result the Building is, *inter alia*, in danger of collapse. A copy of the Engineer's report, dated June 13, 2019, is attached and incorporated herein as Exhibit "1".

73. According to the Engineer, additional specialized inspections should immediately be conducted in order to render a full forensic analysis, to plan the emergency and other remedial work that needs to be done, to file plans, obtain permits and to then schedule and oversee the remedial work.

74. The atmosphere in the Building is hostile towards Plaintiffs. Avera has expressed direct hostility towards Nenov and told Nenov that the Defendants do not approve of Plaintiffs or the way that Plaintiffs are advocating the need for the Defendants to make repairs and implement reasonable accommodations. Among other words said by Avera to Nenov as part of her effort to demean and humiliate Nenov are the following: "I nor anyone else in this building works for you", "I am a Harvard educated COO of a ten million dollar organization", "I understand how it is that you deal with issues like this", and "get out of my apartment."

75. Defendants' hostility is, *inter alia*, reflected in the way that Plaintiffs are excluded from discussions regarding: the Building; the proposed sale of Unit 1; the hiring and use of counsel for the Board; deciding what and why things should be placed on the agendas for Board meetings; and in so many other ways.

76. Amplifying Plaintiffs' feelings of exclusion and disapproval are the fact that when one or

both Plaintiffs are personally encountered, Kirsten, Melissa, Breslin and Avera simply walk by them, barely acknowledge them and adopt expressions to the effect that their acknowledgements, or rare hellos to Plaintiffs, are unpleasant tasks that they are performing with displeasure.

77. On the same day that Nenov submitted the first estimate for work to be done with an explanation and photos of the problems, Breslin retaliated against Plaintiffs by badgering Nenov for Plaintiffs to pay common charges that were lost by both the Building and the post office. At the time common charges were not due for another two weeks and the other owners were not being asked to pay early. Both Breslin and Avera asked Nenov to pay early. Breslin, an officer of the Building, stopped responding to Nenov and would not answer emails when being asked to explain why she told Nenov, multiple times, in email and in person, that Plaintiffs' checks had been cashed at a time when they had not been.

78. Defendants sometimes do not respond to emails from Plaintiffs in a timely or friendly manner; or at all. Defendants avoid discussing Building business with Plaintiffs and make decisions about what should be done regarding the Building without conferring with Plaintiffs. On information and belief, Defendants are carrying out vendettas against Plaintiffs and are collectively making life miserable for them with the hope that they stop asking for repairs or accommodations or that self-dealing be stopped; or that Plaintiffs will sell their unit.

79. By email dated May 21 from the attorney for the individual Unit owners, a "Board meeting [was] tentatively scheduled for May 30, 2019 at 5:30 PM at a place to be designated in NYC." He also said that his employee, Kalbitzer, would attend the

meeting.  Board meetings, according to the Bylaws are to be scheduled by Board

members.  The attorney for the individual Unit owners, Len's father-in-law, said that he

was being paid $1.00 to represent the unit owners thereby suggesting that he was doing a

favor for his daughter, Melissa and his son-in-law.

80. By email of May 29, 2019 Plaintiffs and Defendants were advised that the meeting would

be held on May 30th at a specific date and time.  An agenda that Plaintiffs played no role

in preparing and instructions for how the meeting would be conducted were included in

the email from the attorney for the individual defendants.  Estimates for work to be done

to the Building by contractors Defendants consulted were attached to the notice but none

of the estimates Plaintiffs obtained were included.

81. The email from Melissa's father also advised that his employee, Kalbitzer, would be

present at the Board meeting as counsel for the Board.  He saw no conflict in having him

representing the individual Defendants in their dealings with Plaintiffs while his law

associate and employee was supposedly representing the entire Board (including

Plaintiffs).

82. Plaintiffs were excluded from any discussion about the agenda and were not asked about

Defendants' plan to have an attorney for the Board at the meeting.  The meeting notice

did not provide the Bylaws required advance notice.  It also sought to presume that an

amendment to the Bylaws would be voted on though the text of the proposed amendment

was not provided.  By return email Plaintiffs' counsel advised Defendants that the

Engineer had orally found the Building to be in danger of collapse.

83. Despite work having been done in Units and with respect to the Building since the

issuance of the Building's certificate of occupancy, on information and belief no permits

have been obtained from the Department of Buildings or Landmarks, and the emergency

notices in the entry lobby have people who are no longer associated with the Building, for

many years, listed as emergency contacts

84. Defendants cannot be trusted to have a role in overseeing the work that the Building

needs because of their history of indifference, ulterior motives to sell Unit 1, their lack of

concern for the safety of the Building, their history of not obtaining proper legal work

permits, their history of violations, their ongoing retaliation against Plaintiffs and their

pronounced antipathy to taking corrective action. A receiver should be appointed at

Defendants' expense to represent Defendants in planning and overseeing, together with

Plaintiffs, the repair of the Building.

85. On information and belief Defendants have not proposed or implemented, and do not

have, a policy prohibiting disability discrimination.

86. By email of May 29 Plaintiffs advised Defendants of the orally transmitted Engineer's

findings "that the Building is in need of major repair, that the deck on Unit 3's terrace is

poorly constructed/maintained and is causing critical damage to the Building's walls. . . .

[and] that in his opinion there is a danger of Building collapse."

87. On information and belief Defendants are continuing their practice of ignoring and

neglecting the condition of the Building notwithstanding Defendants having been told

that it is in danger of collapse. To the best of Plaintiffs' knowledge, Defendants have not

asked to communicate, and they have not communicated, with the Engineer and they

have not sought to obtain the opinions of other professionals who have examined the

Building with respect to whether the Building is in danger of collapse, and no

arrangements have been made by Defendants to obtain a second engineering opinion in

response to the findings of the Engineer.

88. The owners of Unit 1 listed their Unit for sale in around mid-May 2019, and it is now believed to be under contract. On information and belief, they have not disclosed, and are not disclosing, to the potential purchasers full and accurate information about the unsafe conditions and water leaks in the Building, the violations of the NYC Building Code, Fuel Code, Fire Code and the Bylaws represented by the work that was done in their cellar space, Plaintiffs' requests for reasonable accommodations or the likelihood of litigation by Plaintiffs on account of everything alleged herein.

89. If the Board does not provide true and accurate information to proposed purchasers about the matters raised in this Complaint Plaintiffs fear that the Board may be creating a liability for all Unit owners, including Plaintiffs, to the prospective purchasers of Unit 1.

90. On information and belief, the Owners of Unit 1 and the other Defendants are cooperating, to the detriment of Plaintiffs, so that Unit 1 can be sold without prospective purchasers learning about the true scope of the problems affecting the Building. Defendants have refused to tell Plaintiffs whether questions have been put to the Board by the prospective purchaser regarding the Building's condition or if so, what the response was.

91. It is and was a conflict of interest, and a form of self-dealing, for Len's father-in-law's law firm, by Kalbitzer, to represent the Board in its dealings with Plaintiffs at the expense of all the Unit owners including Plaintiffs; particularly when Len's father-in-law first appeared to take over as counsel for the Building and later said that he was representing the individual Defendants against Plaintiffs.

92. The exclusion of Plaintiffs from participation in Board matters continues to date as

22

demonstrated by the email Len sent to Plaintiffs on June 13, 2019 in response to one from

Menkes asking about the upcoming Annual Meeting of the Condominium. In it Len

makes frequent use of the word "We" when explaining why things are being done a

certain way. Plaintiffs, who as owners are on the Board, were not consulted about any of

the matters that Len refers to when using the word "We".

93. The actions of the Board and of Defendants as set forth herein are the product of their bad

faith, selective enforcement, self-dealing, and/or discrimination. The Board's exercise of

discretion with respect to its various decisions and actions addressed herein, and such

additional proofs as will be provided following discovery, were done in bad faith, using

intentional dishonest judgment, and in breach of their fiduciary obligation to the common

and general interests of the Board and its Unit owners, and by deliberately singling out

Plaintiffs and Nenov for disparate treatment.

94. By virtue of the foregoing Plaintiffs have been, and are, unable to move into their Unit.

They cannot use it as their place of actual residence and their plan to use it as a home

occupation use permitted under applicable zoning law and ordinances, building code or

other rules and regulations of governmental authorities having jurisdiction, and to see

prospective clients and business associates in Unit 2 are being frustrated. Plaintiffs' lives

have been disrupted.

95. Plaintiffs are suffering, and will continue to suffer, immediate and irreparable harm for

which money damages are not sufficient. Plaintiffs have no adequate remedy at law.

The issuance of temporary, preliminary and permanent injunctive relief is necessary and

warranted.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION OF TITLE III AMERICANS**
**WITH DISABILITIES ACT OF 1990 (ADA), 42 U.S.C.S. §12181 ET. SEQ.**

96. Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

97. Defendants and each of them discriminated against Nenov in violation of Title III of the Americans with Disabilities Act of 1990 (the "ADA"), 42 USC §12181 et. seq., as amended, on account of her disability by failing and refusing to provide necessary accommodations for Nenov in the form of installing accessible ladders, and handrails, keeping the Building's stairways clear of obstacles, removing obstacles from the hatch and the shelf above it so that Nenov's access to the utility room is unimpaired and/or providing Nenov with an alternate accessible means of access to the cellar and/or the roof.

98. Defendants have also failed and refused to take any interim measures to assist Nenov and/or to repair the Building a prerequisite to remediating the air quality and moisture problems that affect Nenov because of her disability in violation of the Act.

99. Defendants and each of them violated the ADA by failing to participate in an interactive process with Nenov.

100. Defendants and each of them retaliated against Nenov because of her disability in violation of the ADA.

101. By virtue of the foregoing Nenov has suffered and continues to suffer mental anguish, threat of physical danger, emotional distress, other compensable injuries and has been deprived of the full ability to use and enjoy her home Unit 2. Nenov should be awarded actual, compensatory and punitive damages as against Defendants.

102. Defendants should be made to be personally liable for any fines and the curing of any violations issued by any governmental agency with respect to the Building.

103. In addition, Plaintiffs should be granted temporary and permanent injunctive

24

relief appointing a receiver to act for and in the place of Defendants, together with

Plaintiffs, and to act together to immediately develop and implement a plan to restore the

Building: so that it conforms to legal requirements, stops water from leaking into and

damaging the Building, insures that the Building is not in danger of collapse, makes

common areas accessible, and otherwise provides for Nenov to have equal services and

safety in the Building.

104.      Temporary and permanent injunctive relief in the form of an injunction directing

Defendants, and each of them to immediately stop discriminating against Nenov because

of her disability and to engage in an interactive process with Nenov regarding needed

reasonable accommodations.

### SECOND CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF
### THE FAIR HOUSING ACT, 42 USC §3601 ET. SEQ.

105.      Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

106.      Defendants and each of them discriminated against Nenov in violation of the Fair

Housing Act, 42 USC §3601 et. seq. (the Act"), as amended, in that they have equally

provided her with equal services or facilities and have denied Nenov the equal

opportunity to use and enjoy the Building and her Unit on account of her disability.

107.      Defendants failed and refused, and are continuing to fail and refuse, to provide

necessary accommodations for Nenov in the form of installing modified ladders, and

handrails, keeping the Building's stairways clear of obstacles, removing obstacles from

the hatch and the window/ledge above it so that Nenov's access to the utility room is

unimpaired and/or providing Nenov with an alternate accessible means of access to the

cellar and/or the roof.

25

108.     Defendants have also failed and refused to take any interim measures to assist Nenov and/or to repair the Building and thereby remediate the air quality and moisture problems that affect Nenov because of her disability.

109.     Defendants and each of them violated the Act by failing to participate in an interactive process with Nenov.

110.     Defendants and each of them retaliated against Nenov because of her disability in violation of the Act.

111.     By virtue of the foregoing Nenov has suffered and continues to suffer mental anguish, emotional distress, other compensable injuries and has been deprived of the full ability to use and enjoy Unit 2. Nenov should be awarded actual, compensatory and punitive damages as against Defendants.

112.     Defendants should be made to be personally liable for any fines and the curing of any violations issued by any governmental agency with respect to the Building.

113.     Plaintiffs should be granted temporary and permanent injunctive relief appointing a receiver to act for and in the place of Defendants, together with Plaintiffs, and to act together to immediately develop and implement a plan to restore the Building: so that it conforms to legal requirements, stops water from leaking into and damaging the Building, insures that the Building is safe and not in danger of collapse, makes common areas accessible, and otherwise provides for Nenov to have equal services and safety in the Building.

114.     Temporary and permanent injunctive relief in the form of an injunction directing Defendants, and each of them to immediately stop discriminating against Nenov because of her disability and to engage in an interactive process with Nenov regarding needed

26

reasonable accommodations.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE CITY LAW

115.    Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

116.    Defendants and each of them discriminated against Nenov in violation of the
Administrative Code of the City of New York Secs. 8-101 et seq. (the "City Law") in that
they have not provided her with equal services or facilities and have denied Nenov the
equal opportunity to use and enjoy the Building and her Unit on account of her disability.

117.    Defendants failed and refused, and are continuing to fail and refuse, to provide
necessary accommodations for Nenov in the form of installing modified ladders, and
handrails, keeping the Building's stairways clear of obstacles, removing obstacles from
the hatch and the window/ledge above it so that Nenov's access to the utility room is
unimpaired and/or providing Nenov with an alternate accessible means of access to the
cellar and/or the roof.

118.    Defendants have also failed and refused to take any interim measures to assist
Nenov and/or to repair the Building and thereby remediate the air quality and moisture
problems that affect Nenov because of her disability.

119.    Defendants and each of them violated the City Law by failing to participate in an
interactive process with Nenov.

120.    Defendants and each of them retaliated against Nenov because of her disability in
violation of the City Law.

121.    By virtue of the foregoing Nenov has suffered and continues to suffer mental
anguish, threat of physical danger, emotional distress, other compensable injuries and has
been deprived of the full ability to use and enjoy Unit 2.  Nenov should be awarded

27

actual, compensatory and punitive damages as against Defendants.

122.    Defendants should be made to be personally liable for any fines and the curing of any violations issued by any governmental agency with respect to the Building.

123.    Plaintiffs should be granted temporary and permanent injunctive relief appointing a receiver to act for and in the place of Defendants, together with Plaintiffs, and to act together to immediately develop and implement a plan to restore the Building: so that it conforms to legal requirements, stops water from leaking into and damaging the Building, insures that the Building is safe and not in danger of collapse, makes common areas accessible, and otherwise provides for Nenov to have equal services and safety in the Building.

124.    Temporary and permanent injunctive relief in the form of an injunction directing Defendants, and each of them to immediately stop discriminating against Nenov because of her disability and to engage in an interactive process with Nenov regarding needed reasonable accommodations.

## AS A FOURTH CAUSE OF ACTION
### FRAUD

125.    Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

126.    Defendants deliberately, and with the intent to deceive Plaintiffs, withheld relevant decision-making information and documents from Plaintiffs with the reasonable understanding that by not revealing such Plaintiffs would rely on the absence of such information and thereby be induced to purchase Unit 2.

127.    Following their purchase of Unit 2 Defendants deliberately, and with the full knowledge that their words and deeds were untrue, led Plaintiffs to understand and believe that Defendants were interested in finding out what, if anything, was wrong with

the Building and with Unit 2 so that if there were any defects that needed repair they could be attended to.

128.     Defendants have continually chosen to ignore, and not to learn about, repairs required by the Building and intended that Plaintiffs would rely on their words to the contrary, followed by their reluctance to do anything, and their ostracizing actions towards Plaintiffs so that Defendants would continue receive uninterrupted common charge payments from Plaintiffs, and continue to use common areas for their personal storage, and continue to use their grills on their decks/garden, Defendants could avoid making/paying for improvements to the Building, and with the intent that Plaintiffs lose interest and abandon their effort to make the Building safe, secure and environmentally sound and ultimately move out from the Building.

129.     Defendants should be made to be personally liable for any fines and the curing of any violations issued by any governmental agency with respect to the Building.

130.     By virtue of the foregoing Plaintiffs and each of them have suffered and continue to suffer mental anguish, emotional distress, an inability to occupy their new home, other compensable injuries, loss of the value of their investment including as well the loss of value of Unit 2 and has been deprived of the full ability to use and enjoy Unit 2. Plaintiffs should be awarded actual, special, compensatory and punitive damages as against Defendants and each of them, including the purchase price of Unit 2 as well.

## AS A FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTIES

131.     Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

132.     Defendants who are Board members and as owners in common of the Condominium and the Building together with Plaintiffs owe a fiduciary duty of care, duty

of loyalty and duty of honesty to each other and to Plaintiffs.

133.     Defendants have breached their fiduciary duties to Plaintiffs by willfully, unconscionably and in bad faith engaging in self-dealing, selective enforcement of the Declaration and the Bylaws, dishonesty to Plaintiffs and vendettas against them.

134.     Defendants have given rights and allowed entitlements to some owners with respect to the Building's common elements, that are denied to, and are not consented to by, Plaintiffs in violation of the Condominium's controlling documents.

135.     Defendants have ignored the fire safety and fuel code violations posed by the use of propane gas fed barbecue grills on patios (Unit 1) and roof terraces (unit 4) and have thereby both placed the health and safety of the owners, like Plaintiffs, in jeopardy and by allowing such conduct are consenting to breaches of their fiduciary duties to Plaintiffs.

136.     Following Plaintiffs' purchase of Unit 2 Defendants hired a lawyer, Kalbitzer, who works for Len's father-in-law to represent them in their dealings with Plaintiffs, and Defendants plan to pay that lawyer out of the funds of the Condominium when Kalbitzer was in reality representing Defendants' and not the Board's interests.

137.     Defendants are using, and have used, Len's father-in-law's law firm to represent them in their negotiations with Plaintiffs and for purposes of presenting and developing Defendants' positions and ideas in response to Plaintiffs. They have used that lawyer to advance the violative idea that Plaintiffs are not entitled to equal treatment under the Declaration and Bylaws and that accommodations can be continually deferred.

138.     Following Plaintiffs' purchase of Unit 2, Defendants separately hired Len's father-in-law to represent Defendants individually and notwithstanding his asserted position of being their individual representative Len's father-in-law has issued Board

notices and made certain arrangements on behalf of the Board.  As a result, Len's father-in-law is in actuality representing both the Board and the individual Defendants, no part of which has been consented to by Plaintiffs.

139.     Defendants should be temporarily and permanently enjoined from engaging in such further self-dealing and breaches of fiduciary duties.  Defendants should be made to be personally liable for any costs or fees charged or to be charged by Len's father-in-law or his associate/employee, Kalbitzer, for the period subsequent to Plaintiffs' purchase of Unit 2 and to reimburse the Building's general fund with any amounts previously used to pay said attorneys for the period subsequent to Plaintiffs' purchase of Unit 2.

140.     The owners of Units 1 and 4 should also be directed to permanently remove their gas fired barbecue units respectively from their patio and roof terrace and not to restore same, and all common spaces used by the owners of Units 1, 3 and/or 4 should be vacated forthwith and their future use determined in accord with the Building's governing documents.  The owners of Unit 3 should be directed to remove their deck at their cost and not to install a replacement until plans and permits for same are first prepared, filed and approved.  Defendants should also be made to be personally liable for any fines and the curing of any violations issued by any governmental agency with respect to the Building.  Breslin and Avera should also be made to restore Unit 1 to lawful Code status.

141.     By virtue of the foregoing Plaintiffs and each of them have suffered personal injuries and other compensatory damages, including as well for the pain and suffering they have each sustained, for which they should be compensated by Defendants and each of them.  In addition, punitive damages should be assessed against Defendants.

**AS A SIXTH CAUSE OF ACTION**
**DEFENDANTS COMMITTED WASTE**

142.     Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

143.     Defendants have committed, and are committing, waste, *inter alia,* by their neglect of the physical condition of the Building; by their negligent and/or deliberate refusal to maintain the Building; and by their failure or deliberate unwillingness to fully ascertain the nature of, and to repair, its problems stemming from the deterioration of the Building; and by their negligent and/or deliberate allowance of water leaks and the defective installation of the deck appurtenant to Unit 3 to undercut the structural integrity and safety of the Building; and by allowing Unit 2 to be rendered uninhabitable.

144.     By virtue of Defendants' actions, as aforesaid, Plaintiffs have sustained and are sustaining damages for which they should be compensated by Defendants and each of them. The owners of Unit 3 should be directed to remove their deck at their cost and not to install a replacement until plans and permits for same are first prepared, filed and approved. Defendants should also be made to pay all of the fines, violations, costs and expenses related to bringing the Building to a condition that it, and Unit 2, are structurally sound, free of leaks, safe and inhabitable.

## AS A SEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT BY DEFENDANTS

145.     Plaintiffs repeat paragraphs 1 through 95, inclusive, of this Complaint.

146.     By virtues of their actions, as set forth in this Complaint, Defendants, without cause of justification therefore, breached the terms of the Declaration and Bylaws of the Condominium and the Board and their obligations to Plaintiffs.

147.     Plaintiffs have fully performed all their obligations under the Declaration and Bylaws of the Condominium and the Board.

148.     By virtue of the foregoing Plaintiffs have sustained damages for which

Defendants and each of them should be made to pay Plaintiffs and amount equal to their

direct and consequential damages in an amount determined by the Court. The owners of

Unit 3 should be directed to remove their deck at their cost and not to install a

replacement until plans and permits for same are first prepared, filed and approved.

WHEREFORE Plaintiffs request the entry of judgment in their favor and against

Defendants and each of them as follows:

a.   Awarding Nenov actual, compensatory and punitive damages in an amount to be

determined after trial on account of Defendants' violation of the ADA, the Act

and the City Law;

b.   Awarding Plaintiffs actual, compensatory and punitive damages in an amount to

be determined after trial;

c.   Granting Plaintiffs temporary, preliminary and permanent injunctive relief against

Defendants as follows:

(i)     appointing a receiver to act for and in the place of Defendants,

together with Plaintiffs, and for the receiver to act together to

immediately develop and implement a plan to restore the Building:

so that it conforms to legal requirements, stops water from leaking

into and damaging the Building, insures that the Building is not in

danger of collapse, makes common areas accessible, and otherwise

provides for Plaintiffs to have equal services and safety in the

Building;

(ii)    directing Defendants, and each of them to immediately stop

33

discriminating against Nenov because of her disability and to engage

in an interactive process with Nenov regarding needed reasonable

accommodations;

(iii)    directing the Board to require the owners of Unit 1 to immediately

bring their Unit into compliance with the Building code, to

immediately remove their personal belongings from the common

area of the cellar and from the cellar closet that is beneath their

stairway and which opens into the common area, and not to use a gas

grill in their garden;

(iv)    directing Defendants to cause Kirsten and Richard Purtich to remove

the deck appurtenant to their Unit, at their expense or at Defendants'

expense, and not to install a new deck until such time as remedial

work has been done to the Building and then after plans are filed,

and approved and assurances are in place to inspect the work as it is

being done and then upon completion;

(v)    directing Defendants to pay the full amount of all fines and penalties

that may be charged in connection with matters related herein and

which pertain to any Building violations, failures to file plans and

have them approved, improper storage of things within the Building,

improper use of gas barbecue grills, and failures to maintain the

Building in a safe and lawful manner;

(vi)    directing Defendants to pay, and hold Plaintiffs and the Building's

accounts harmless from, all monies owed to Kalbitzer and/or Len's

34

father-in-law's law firm for the period of time running from when Kalbitzer first became involved with the proposed purchase of Unit 2 by Plaintiffs and running to the end of her retainer by Defendants;

(vii) directing Defendants to stop breaching their fiduciary duties and engaging in self-dealing and to observe the requirements of the Declaration and the Bylaws; and

(viii) directing that Plaintiffs have no obligation to pay common charges until such time as their Unit is habitable and the Building is safe and requiring Defendants to credit back to Plaintiffs an amount equal to what they paid as common charges since their purchase of Unit 2;

d. Granting Plaintiffs all of the foregoing together with interest, costs and attorneys fees where provided for by law together with such other and further relief as this Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Date: New York, NY
June 17, 2019

Yours, etc.

Pedowitz & Meister, LLP

Arnold Pedowitz
260 Madison Ave., 17th Fl.
New York, NY 10016
212-403-7321
pedowitz@pedowitzmeister.com
Attorneys for Plaintiffs